Next case on our docket is 19-60937 Singh v. Garland. Mr. Rogers? Good morning. Is that your breakfast? My name is Peter Rogers, and I represent the petitioner Daljinder Singh, who is an applicant for asylum. The client's asylum application was denied because the immigration judge in this case, Judge Agnelis Reese, formerly from the Oakdale Immigration Court, determined that Mr. Singh was not credible. How Judge Reese arrived at that conclusion is at the heart of my client's claim. There are two key issues for the Court's consideration this morning. The first issue is whether Judge Reese adhered to the procedural safeguards in matter of RKK, which are applicable when an IJ relies on interproceeding similarities in making adverse credibility determinations. We respectfully submit that she did not. The second issue is whether Ms. Immigration Judge's 100% denial rate of her asylum cases over the course of 2011, straight through my client's decision in 2019, whether that reflects a bias that came to bear on Judge Reese's consideration of this case, and therefore violated my client's due process rights. Now, Your Honors, we have briefed at length RKK. The Court's familiar with the decision, so we don't need to redo that here. But we were encouraged to see your colleagues, Judges Higginbotham, Southwick, and Willett, actually agree that the IJ failed in her application of RKK, and their opinion associated with the stay in this case. But the question here is why was the IJ's application of RKK flawed? It was flawed because she didn't exercise the caution that the case law requires when applying interproceeding similarities. Central to RKK, in cases from Second Circuit that it relied on, was the importance of preserving fairness in proceedings. Those courts realized that utilizing interproceeding similarities is dangerous, and therefore you have to exercise great caution, and you have to do that for two reasons. The first reason is to ensure that innocent applicants are protected. The Second Circuit stated that, to be sure, it is far more dangerous to draw such an inference from interproceeding similarities as opposed to intraproceeding similarities. In that case, they're actually comparing two different documents with language from different documents and comparing the similarities. In light of these dangers, the Second Circuit said, it's clear that interproceeding cases call for caution. And what the Second Circuit did in that case, and I keep citing that case because that underlay RKK, the Second Circuit lauded the immigration judge in that case. Why? Because that judge was meticulous in her care for providing notice of these similarities to the asylum applicant in that case. The IJ pointed out 23 specific places where two affidavits from different proceedings were strikingly similar in language and grammatical structure, and then provided multiple opportunities for the applicant to explain the similarities. And the second reason that it's so important to exercise great caution when using interproceeding similarities is so that a court like this Honorable Court can do its job effectively. The court in the Second Circuit said, when an IJ takes such an approach, referring to the IJ in the underlying case, when an IJ takes that kind of approach to interproceeding similarities, a reviewing court can confidently defer to the reasonable inferences drawn from those similarities. So we contrast that case to what we have in Mr. Singh's case. In MHI and RKK, the judges provided documentation. They cited the statements. They cited documents, applications, language, punctuation, syntax. Contrast that to what Judge Reese did, where she literally in the middle of proceedings, when I used the word hockey sticks, began to rattle off a series of similarities that she began to recall from a series of cases that she had allegedly presided over. That's how she gave my client notice of the similarities. Never provided a document for comparison. Never provided an application for comparison. Did you represent the parties in those hockey stick cases? No, I did not. Were you aware of them, the similarity? Was I aware of? I was not. I mean, I only represented my client with respect to that. I explained the issue with respect to hockey sticks. That was one of the issues that I tried to help her understand on the spot, which was that hockey sticks, field hockey is a national sport in India, and so people have hockey sticks like Americans may have baseball bats. And that's what I explained to the judge at that point in time. But again, there had been no opportunity to look at the language of other statements, applications that used the terminology. Did EIJ specify a particular case she was concerned about? She did not. Because I mean, I've sat on a case with hockey sticks. I mean, yeah, sure, I remember from three years ago. But when somebody wants to go out and beat somebody up in India, they reach in their closet and they find a hockey stick. They don't find... I mean, I think the point is, is that that may or may not be true. It's like, it's neither here nor there. I mean, so they're hockey sticks. Right. Well, but she zoomed in on that. And then she, again, she stated a series of other similarities, just really out of the ether. She didn't provide any documents. So there was no way to actually respond and compare. In other words, she didn't say, you know, this is like this case that I had last year called X. No. Here are the documents in X, and I need a response from you about why you haven't cut and pasted these to represent your client and you have 30 days to respond. That's correct. It was just fact patterns she had seen. Fact patterns she had seen, and boy, this one sounded a whole lot like it. Let me ask you this. Let's assume, let's assume only for the sake of argument that I agree with you with respect to the matter of RKK issue. Now, the immigration judge and the BIA did find credibility problems with Mr. Singh, right, with respect to the dating of certain records and with respect to a recounting of a story about who took him to the hospital. What is your response to the argument that I think your friend on the other side is making is that, okay, let's put the RKK issue to one side. We can still deny the petition on the basis of the credibility choices. The credibility findings made by the IJ. That's correct. The case law does say that while minor inconsistencies may be sufficient for an adverse credibility determination, the IJ's credibility finding must be supported by specific and cogent reasons derived from the records. So, in response to your question, Your Honor, was that the totality of her adverse credibility finding was based upon, first, RKK, secondly, the medical records discrepancy with respect to dates, and then a letter from a farmer named Man Singh. And so, in that circumstance, when confronted with that, what became clear after further questioning and redirect is that my client was referencing a different set of documents than the documents that were actually before the court at that time. My client made clear that ultimately the documents that he was provided when he was treated were The documents that she had before her were documents that the father had provided, which were basically summaries of the treatment, which were both dated December of 2018. And the problem was he had left in October of 2018 and had stated, well, I got these when I, before I left. But he was referencing different documents. It's important to remember, too, we were preparing this case outside. He was detained in Prime Prairie. And so, access to that kind of thing made reviewing difficult. But ultimately, there was a very valid explanation for the discrepancy that he was referring to a different set of documents than the ones that the IJ was referring to. So, I mean, we can look at that. I think you will recognize that our standard of review with respect to a credibility determination  I understand that, Your Honor. And personally, I believe that's partially why the judge finds, makes adverse credibility determinations because it's very difficult to overcome that. And again, that attaches to our belief that she was biased based upon her 100 percent denial rate over eight years and the way she treated the evidence in this case. But getting back to your original question, you have to look at the totality of the circumstances. So, the way we see it is, okay, there's RKK. We're putting that aside for the moment. Then there's the medical records, which we think there was a valid explanation for. Then there's the question about the Man Singh letter, the letter where Man Singh said, this was the farmer who had helped him after one of the attacks. His letter says that he found him, he was bleeding profusely, and he wrapped his head, and then he took him to his home. And then he said that his father took him to the hospital. Well, my client testified, my client testified that he went to the hospital with his father and Man Singh. That was the discrepancy. And so, when asked about that, he said his explanation for that was that, well, he only took us there, then he left, and then he left to go back to his farm, which I understand reasonable minds may differ on the validity of that explanation, but where does that leave us? Because those are the only discrepancies in the entire record that the judge cited for this adverse credibility determination. And if you throw out RKK for purposes of this argument, and if you believe there's a reasonable explanation for the medical records that were in dispute, then you're left with this one discrepancy in this one document. You have to compare that to the rest of the record. And the rest of the record is overwhelmingly, overwhelmingly shows he was credible. He did make a claim for, a valid claim for asylum. And when you compare the total record, then you would have to say that you cannot give deference to this adverse credibility finding. But in terms of the bias issue and how that manifested itself, for example, the immigration judge, the immigration judge, there was a set of facts in this case where we were stunned by the way she interpreted that evidence, and we felt, again, we felt this was evidence of her bias. In her statement, in her decision, in her decision, the immigration judge says, further, Petitioner still has family living safely in India. Though Petitioner testified his father was rear-ended and nearly run over by the same people who allegedly attacked the petitioner, he failed to provide evidence his father was attacked by the same members who attacked him. Harmanpreet Singh testified the attack occurred another place three months after the petitioner left the country, outside of Petitioner's self-serving testimony. There's no evidence his unknown attackers would be pursuing the petitioner. So this is how the judge characterized evidence, and she says that she took this evidence, which we believe shows clearly, wait a minute, these people are still pursuing my client after he's gone. Why? Because they attacked his father after he left twice. BJP members, the members of the party that my client was afraid of, attacked his father twice, and they were identified as BJP members. We had medical records to prove it. We had eyewitness testimony to the attack, which is extraordinarily rare in an asylum case. We actually had an eyewitness to the attack on his father who testified that they saw these people beating up my client's father, beating up my client's father, and that, and screaming, where is Dalginder? Looking for my client. But Judge Reese, we see that as, this clearly corroborates the claim. This clearly lends to the credibility when you've got an eyewitness that said, yes, these things actually happened, but this judge said, no, we don't know if it was the same people. It was in a different location. I understand this argument to be towards basically undermining the IJ's credibility finding. That's what I understand your argument to be. That's certainly something we can review. We've reviewed it in other cases. The unusual argument here goes to the bias or the presumed, the purported bias of the IJ, right? That's one we don't see often. So my first question is, as a general matter, if you find yourself in front of an IJ who has a bias, for whatever reason, relationship to one of the lawyers, I don't know, is there, and this is just an informational question, is there a mechanism for raising that issue and getting the IJ recused or resigned? You could file a motion for the IJ to recuse herself. That would be a possibility. But of course . . . I mean, was that done here? That was not done here. But of course, this all happened in the moment. So in the moment, the issues that we were concerned about were all raised, and after . . . Presumably, you could have found out, I mean, because you're emphasizing the reversal rate of the IJ, right? The . . . I'm sorry, the denial rate of the IJ. Yes. But you could have . . . I mean, is it conceivable that you would have made a motion to recuse the IJ on the basis of her denial rate? Even as this Court has stated, I believe you can't . . . a high denial rate is not grounds for recusal in a case, but when you combine that with the way she handled the case, which oh, of course, that's . . . we had to do the case to see how that would handle. But we would never have been successful, first of all, on a motion to recuse based upon a hundred percent denial rate. I don't think the case law supports that. But when we saw the application of the law in RKK, and when we saw how she treated evidence . . . I guess you're asking us, as I understand it, to factor in the denial rate into the relief that you want here, right? You want us to write an opinion that says, look, she did this, she did that, and she has a hundred percent denial rate. We think that the relevance of the denial rate is that she never . . . is that it goes to how she treated the evidence of the case, which means he did not receive a full and fair hearing. So his due process rights were violated. But ultimately, what we're looking for is we believe that the substantial deference is not . . . her adverse credibility decision is not entitled to deference for the reasons we've . . . What if it were a 95 percent rate? Well, again . . . Where do we draw the line? There's not . . . I agree, Your Honor. I don't know that there is a line, but it was just . . . We have to do some line drawing where you say that affects the balancing, the substantial evidence, the weight we give to an IJ's determination.      I'm not sure that's what you're saying. I'm not sure that's what you're saying. Well, I . . . It would definitely be a sliding scale. I'm saying that it's the combination of a perfect denial rate with the way that bore out in this case, which was the way she treated evidence, the way she misapplied the law in this case. Do you realize how dangerous it is to say statistically, X number means there's some bias or prejudice on a judge's . . . Well, again, well, with respect to the bias, that is a fact.         It's a fact. It's a fact. It's a fact. It's a fact. It's a fact. It's a fact. But ultimately, on the law, it's clear that she misapplied RKK, no question, and particularly because I did say that she listed similarities in RKK and we disputed whether she gave reasonable notice and whether she gave a reasonable opportunity to respond. In her decision, she cited nine similarities that she relied on to deny my client's case, which she never raised in the proceedings. He had no notice, no opportunity. That goes to the argument of the judges. That's the RKK issue, isn't it? Right. So, but with respect, we believe that the combination of all these factors shows that even outside, even outside of the denial rate, that the judge had an inclination. In fact, she says in the record, she says, this is like every other man party case I've seen. So she said on the record, this is like every other man party case I've ever seen, which she denied all of them because she denies all of her cases. Thank you. When did you know of the 100 percent denial rate? While you were arguing the case or preparing for appeal? I don't, in all honesty, I don't actually recall. I don't actually recall when we learned that. I'm sure we looked at it beforehand, but your judge is your judge. My time has expired, right? Right, but you can answer the question. So, yes, I'm sure we probably looked up the denial rate prior to the hearing. We look up most judges' denials rate prior to the hearing, but still, in our view, that doesn't give us grounds to say we can't select another judge because there's a high denial rate. We have to see how that plays out, and we think it played out exactly the way we thought it might. Thank you. Good morning, Your Honors, and may it please the Court, Michael Heiss on behalf of the Respondent, the Attorney General of the United States. Substantial evidence supports the agency's adverse credibility finding here, and the agency, specifically the immigration judge, properly considered interproceeding similarities between cases that she had heard before. As Your Honors have all noted, Your Honor specifically noted a case you've had before involving hockey sticks. That happens. Judges have personal experience with specific cases that is brought to bear, and it's not improper to bring that to bear. Matter of RKK lists out a certain procedure for judges to apply that, given that these kinds of cases are not unusual. For example, this Court hasn't had nearly as many, but the Second Circuit and the Ninth Circuit for years handled, I would assume thousands, I personally handled at least a hundred cases involving people from China having children in the United States and claiming to fear being sent back. There's a whole separate ground within the immigration nationality, excuse me, the INA, about that exact kind of case. And there were thousands of adverse credibility cases related to those that had striking similarities. So the whole idea that a past case can inform a later case is not unreasonable. And yes, there are procedural safeguards that need to be followed. The IJ needs to provide notice of the similarities, provide a reasonable opportunity to respond, and consider the totality of the circumstances when rendering a related finding. Petitioner's contending that that didn't happen here, and actually just right at the end suggested that the similarities between the other Indian cases that Judge Reese had handled were never raised during the proceedings. That's simply not the case. Petitioner was absolutely given an opportunity to consider the myriad similarities between the prior cases that the judge had seen and his own case. Were the cases referred to by name? They were not. RRKK isn't that specific. It's a procedure, but it's not necessarily formulaic. Especially when there are so many of them. This is not an unusual case. Our office handles many of these cases ourselves. We see them often. It is not unusual to see this very similar fact pattern. And again, that's why I was referencing the Chinese cases. It sounds like you've handled a number of these cases. RRKK has become an issue. Or how do we follow the guidance in RRKK? Can you tell me whether what the IJ did here is typical or atypical in terms of how the issue comes up and how we work through the RRKK process? Your Honor, to be perfectly honest, I have not seen an RRKK case before. I have seen judges prior to RRKK. I've been doing this for 14 years. I don't remember the year of RRKK. 2015. Somewhat recent. I also don't get assigned new cases anymore. That's a whole other story. Anyway, prior to RRKK. And that's why RRKK was decided the way it was, was to kind of organize that. But again, Your Honors have all handled similar cases before with cases involving, I would assume, Indian asylum cases or even just asylum cases in general where there's certain fact patterns that just kind of repeat themselves. That's not unusual. And it's not unusual for a judge to have that experience and rely on that. Now, does the judge need to specifically cite, well, in this case this happened, in this case this happened? No. Because it's personal experience for the judge. Does that engender bias? Not automatically. Absolutely not. I understand it more to be a due process issue. Sort of like, okay, well, I'm going to look at some evidence from my past experience that I remember in this case. And it seems to cast doubt on your credibility and what do you say. I can understand how a petitioner might be in that position and say, well, I'm not sure what you're talking about. What do you want me to rebut? Absolutely, Your Honor. And that's why RRKK provides the opportunity to respond. And again, specific to this case, it's Record on Appeal, pages 192 to 99. There's a colloquy between Petitioner's Counsel and the judge about these similarities and what they mean. At that point, and as Your Honor suggested earlier, he could have asked for a continuance. He could have objected, he could have done something at that point to ask for more time. And didn't. Did he ask for a recusal? He didn't. And yet is asking this court to essentially render Judge Reese inept as an asylum judge. If she is unable to adjudicate any asylum case based on the cases that are brought to her, if what the court decides here, that her denial rate is automatically, she's biased in every asylum case, that means she can't be an asylum judge. That would be quite a decision. It would. That would be remarkable. But that's essentially what Petitioner's asking. That's different. As I understand it, that's different from did the IJ properly follow the guidance in matter of... Yes. Okay, that's a different argument. But again, the RKK is very straightforward. Provide notice, opportunity to respond, consider the totality. And the record shows that that happened here. Did Petitioner need more notice or could have asked for different notice? Yes, Petitioner could have asked for these things. Petitioner could have asked for a continuance. Petitioner could have said, I'm not sure what case you're referring to, Your Honor. He didn't do that. So to fault what happened after the fact doesn't really comport, doesn't amount to a due process denial because it's up to the Petitioner to protect his own rights. And yes, the agency has to follow due process and provide a fair opportunity to be heard. And he had that. That he didn't ask for a continuance is not the agency's fault. So again, RKK does not require the kind of rigidity that Petitioner is asking for. It does not require necessarily specific documents even to be cited. It allows for, quote, or other evidence to be considered. And the judge's own experience should qualify as that. And given the... That's where, I know it says or other evidence, but are you saying that the judge's own prior experience in adjudicated cases qualifies as other evidence? It can. And does here. That Petitioner didn't ask for specific citation. Again, RKK doesn't specify that the judge has to say in case X, case Y, case Z, these things happened. The fact that the judge has handled so many of these... That's an odd thing to say, that a judge's prior experiences are evidence. Then you would be entitled to cross-examine the judge. It's not evidence. The use of the word evidence is a bit of a stretch in that circumstance. Yes, Your Honor. It's experience. Wouldn't it just be awareness of former case law? Yes. Evidence in the, I guess, almost non-legal term. More colloquial. Proof. Whatever. Whatever synonym we'd like to use. Again, it's just the judge's experience in handling these similar cases was brought to bear here. And that's a question of judicial efficiency for these judges that see these cases over and over again. They see the same cases. It is not unusual for individuals from various countries to get wind of a story that they hear works. So how do you rebut, what if the facts didn't exactly as stated happen to Mr. Singh? And he has the hospital records of when he was admitted. He has the farmer saying, I saw him bleeding. I took him to the hospital. Just assume with me that these are all in the record. Yes. Is that enough to rebut that this is not a made-up story, or what? If that individual is not present to testify to be subject to cross-examination, it's a question of weight at that point. If those things are in the record, but again, the records themselves here are indivisible. And as Your Honor was discussing, those were separate from RKK in terms of, the RKK analysis, in terms of them lacking credibility themselves or engendering an adverse credibility finding given Petitioner's own very confusing testimony about the circumstances under which they were obtained. He first says, when their authenticity was first questioned, given that they were dated after he left India, he says they were made when he got treated. That's Record on Appeal 178-80. He later says, actually in the middle of that says, we later on obtained these originals. That's a direct quote, ROA 179. But then again, later says, he got them when he was treated. That's ROA 180. But then he says, we got them later, and I got them from my father. That's ROA 200-01. What is the immigration judge supposed to do with that? Are you saying, are you arguing that, quite apart from whether a matter of RKK required some sort of different proceeding here, that we should deny the petition on the basis of these independent credibility findings? That's certainly within the realm of possibility here. If the court is troubled by how RKK was applied, it could ultimately decide it's harmless error given the additional inconsistencies in the record. What is, I don't recall, the formulations for standards of review, but we are reviewing a credibility determination of an IJ. That's reviewed for substantial evidence. Whether or not substantial evidence supports the determination, could a reasonable fact finder, could no reasonable fact finder agree with the agency's finding here. And based on just that alone, what I just reviewed from the record, that one inconsistency regarding, on their face questionable documents, given that they were dated after his arrival in the United States, once he is in removal proceedings. At that point... I don't recall, does she say, does the IJ say, oh, I've seen a bunch of other immigration cases of this nature that have these bad medical records, or does she, I mean... That's specifically mentioned. Is this linked to the RKK issue, or is it separate from it? It's definitely linked, but it can stand alone. The immigration judge record on appeal 191 to 98 listed out a panoply of similarities between past cases, and the last one is that the petitioner in these cases provides handwritten, non-contemporaneous medical records as corroboration of the claim. There's also a second adverse credibility ground here, independent of RKK, somewhat, not entirely independent in that, in the past cases, a neighbor of some kind, a farmer, comes to the person's aid, chases off the attackers. But here we have the statement, and again, we have confusing testimony about what happened. And again, the immigration judge is allowed to question that. If the petitioner can't provide a consistent statement, whether or not this farmer that rescued him, that's a substantial thing when you come to your rescue, and you don't remember if that person took you to the hospital, took you home, went with you to the hospital, did your father take you to the hospital? These are substantial events, and for someone to not be able to provide a consistent statement on that, standing alone, that standing alone, leave out the medical records, leave out all the RKK factors, that inconsistent statement is central to what he's claiming happened to him. That is his story. That is not a minor inconsistency. That is not what he's claiming about his story. And again, petitioner is claiming, I provided explanations, reasonable explanations. The immigration judge is not required to accept those. The immigration judge has to consider them, but does not have to accept them. And what we have here, again, based on the totality of the circumstances, even if the court sets aside the RKK considerations, we have two patently valid independent adverse credibility grounds that the IJ can properly rely on and did properly rely on that the board sustained to find that this petitioner lacked credibility. The court has no further questions? Thank you, Your Honor. Your Honor, with respect to the contention about if the IJ had seen, if the IJ had seen these cases over and over and over again, which she apparently had, she was easily in a position to say, here's a statement from this case, here's an application here.  and confronted my client with all sorts of examples and confronted my client with all sorts of examples and confronted my client. Instead, she just said, I've seen this, I've seen this, now you need to respond to it, and that's it, that's all, that's the notice that she was provided, and that was all the opportunity that he was given in order to respond to it. With respect to this, why the discrepancy in the letter from Man Singh, where my client said he went to the hospital with Man Singh, and Man Singh, he didn't, well, it's also important to remember that he was bleeding, as he said, bleeding profusely, so people may not recall things correctly, they may or may not, it has to be allowed for the fact that that may have been the case in this circumstance, but again, when you step back and you look at the whole of the record and the statements from this judge, it becomes clear to us that the adverse credibility finding cannot stand, and the record, we have letters from his party leader that says yes, he's a member of the Man Party, we have photographic evidence of the injuries to the father, we have medical records of the injuries to the father, we have eyewitness testimony, and the thing is, none of that was called into question by the judge, none of it, the only thing called into question were the matters that we've already talked about, so when you look at the totality of the circumstances, in our view, it is clear and understandable and understandable and that he made his claim for asylum. The judge also said, outside of the credibility issue, I don't think he qualifies for asylum. Well, we've briefed this issue, he certainly showed that he'd been persecuted in the past, and because he'd been persecuted in the past, he's entitled to a presumption of persecution in the future, and the government's done nothing to rebut that presumption, and with respect to internal relocation, he's been living safely, but they provided no evidence to show that, in fact, the evidence in the record shows that when his father goes to different parts of India, that's where he's attacked, that's why that other evidence was so relevant, the judge said, when your father was attacked in a different location, what's a different location, what's the big deal, you can go back to where you used to live, but the point of that evidence is that he was living in India, those were her words, after two attacks on the father. Thank you.